**Elmer KROGMAN, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**R. Dale STERRITT, Jr., et al., Defendants.**

**No. CIV. A. 3:98–CV–2895–M.**

United States District Court, N.D. Texas, Dallas Division.

March 29, 2001.

See, also, 1999 WL 1455757.

Frank E. Goodrich, Attorney at Law, S. Ann Saucer, Attorney at Law, Baron & Budd, Dallas, TX, Dennis J. Johnson, Attorney at Law, Law Office of Dennis J. Johnson, South Burlington, VT, Ralph M. Stone, Attorney at Law, James P. Bonner, Attorney at Law, Lee S. Shalov, Attorney at Law, Shalov Stone & Bonner, New York City, for plaintiffs.

Amy Brooks Ganci, Attorney at Law, Friedman & Feiger, Dallas, TX, for Continental Investment Corporation.

Marc Gary, Attorney at Law, Lily Fu Swenson, Attorney at Law, Mayer Brown & Platt, Washington, DC, Robert W. Coleman, Attorney at Law, Tracy W. Berry, Attorney at Law, Brown McCarroll Trammell Crow Center, Dallas, TX, Gary Orseck, Attorney at Law, Robbins Russell Englert Orseck & Untereiner, Washington, DC, for Grant Thornton.

Swan Financial Services Inc., Bullard, TX, pro se.

## MEMORANDUM OPINION AND ORDER

LYNN, District Judge.

Before the Court is Plaintiffs' Motion for Class Certification, filed August 16, 1999, the Response of Grant Thornton and Plaintiffs' Reply, along with briefs and appendices submitted by the parties. Having considered that material and the applicable authorities, as well as the arguments of counsel at a hearing held on October 11, 2000, and the testimony of experts at a hearing held on November 16, 2000, the Court **DENIES** Plaintiffs' Motion for Class Certification.

## I. Background

This action is brought on behalf of all investors who purchased the common stock of Continental Investment Corporation ("CIC") during the period of November 27, 1996 through October 26, 1998 (the "Class Period"). Plaintiffs are six individuals who purchased CIC common stock during the Class Period.[1] Defendants include former CIC executives, CIC's outside auditor and accountant, and a Dallas brokerage firm.

The gravamen of Plaintiffs' Complaint is that Defendants defrauded Plaintiffs by misstating and omitting material facts regarding CIC in numerous SEC filings and other disclosures to the market. Grant Thornton, LLP ("GT"), CIC's auditor, issued three formal audit opinions, which are alleged by the Plaintiffs to be false and misleading. Plaintiffs also allege that CIC sponsored purportedly independent securities analyst reports about CIC, which recommended that investors purchase CIC stock, and that the Defendant executives are responsible for that. At the beginning of the Class Period, CIC's common stock was trading at or above $20 per share. Today, CIC is bankrupt and the shares are virtually worthless, if not totally so.

Plaintiffs filed this lawsuit in December 1998. In their Complaint, Plaintiffs allege that Defendants are liable for violations of

---

1. Although twelve lead plaintiffs moved this Court for class certification, six of those plaintiffs were withdrawn as proposed class representatives pursuant to an Agreed Stipulation Regarding Motion for Class Certification, filed January 12, 2000. Accordingly, Plaintiffs now seek the appointment of Elmer Krogman, Herbert Byrnes, Ted Kiewicz, James Lomanto, Russell Schroeder, and Robert Solis as class representatives.

Sections 10(b) and 20(a) of the 1934 Securities and Exchange Act, and for common law fraud.

Plaintiffs seek certification to represent the class of purchasers and other acquirers of CIC common stock during the Class Period.[2] Defendant GT, the only Defendant to respond to Plaintiffs' Motion for Class Certification, argues that Plaintiffs' claims should not be certified because the class representatives' claims are not typical of the class, and individual issues of reliance predominate over issues common to the class.

## II. Standard of Review

A district court has wide discretion in deciding whether or not to certify a proposed class, and the standard of review is abuse of discretion. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981); *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 471–72 (5th Cir.1986). This Court must conduct a rigorous analysis of the Fed. R.Civ.P. 23 ("Rule 23") requirements before deciding whether or not to certify a class. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

When determining certification, a district court may look beyond the pleadings to determine whether the requirements of Rule 23 have been met.[3] *Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir.1996). This is necessary because a court "must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Id.* (citing MANUAL FOR COMPLEX LITIGATION § 30.11 (3d ed.1995)).[4]

**2.** Defendants and affiliated persons or entities are excluded from the class.

**3.** Plaintiffs argue that their allegations must be taken as true, because an inquiry into the merits of the case is not appropriate at the class certification stage. This Court does not agree that it is bound to the pleadings alone.

**4.** *See Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ("Sometimes the issues are plain enough from the pleadings ... and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469,

## III. Analysis

For Plaintiffs to maintain a class action, the four prerequisites set forth in Rule 23(a) and at least one of the requirements enumerated in Rule 23(b) must be met. Plaintiffs have the burden of proof of those requirements. *Applewhite v. Reichhold Chem., Inc.*, 67 F.3d 571, 573 (5th Cir.1995). Rule 23(a) states:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Plaintiffs argue that this case meets those requirements and those of Rule 23(b)(3), which requires that:

> the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3).

### A. Fed.R.Civ.P. 23(a)

#### 1. *Numerosity*

Rule 23(a)(1) requires that the class be so numerous that the joinder of all members would be impracticable. Plaintiffs are not required to demonstrate the precise

98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) ("[T]he class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' ") (quoting *Mercantile Nat'l Bank v. Langdeau*, 371 U.S. 555, 558, 83 S.Ct. 520, 9 L.Ed.2d 523 (1963)); *id.* at 469 n. 12, 98 S.Ct. 2454 ("Evaluation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims. The typicality of the representative's claim or defenses ... and the presence of common questions of law or fact are obvious examples. The more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits.").

number of potential class members to satisfy the requirement that joinder is impracticable. *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir.1981).

Plaintiffs assert that during the Class Period, more than 12 million shares of CIC common stock were outstanding. CIC had approximately 1200 shareholders, other than those whose stock was held in street name. GT does not challenge certification on the ground of lack of numerosity. The Court finds that the size of the proposed class is sufficiently large to satisfy Rule 23(a)(1).

### 2. *Commonality*

Rule 23(a)(2) requires that there be questions of law or fact common to the class. The threshold of proof of commonality is not high, as it does not require a complete identity of claims among class members. *Jenkins*, 782 F.2d at 472. Moreover, in securities fraud litigation, the existence of alleged misrepresentations in published documents has been held to satisfy the common question requirement. *See Simpson v. Specialty Retail Concepts*, 149 F.R.D. 94, 98 (M.D.N.C. 1993) (holding that in the Rule 10b–5 context, misrepresentations in annual reports, interim reports, and press releases satisfy the common question requirement).

In the present case, Plaintiffs allege the following questions of law or fact common to all members of the proposed class:

(a) Whether the federal securities laws were violated by Defendants' acts;

(b) Whether statements made by Defendants to the investing public during the Class Period misrepresented or failed to disclose material facts about the business, operations, prospects, and financial condition of CIC;

(c) Whether Defendants participated in and pursued the common course of conduct alleged in the Complaint;

(d) Whether Defendants acted willfully, knowingly, or recklessly in omitting and/or misrepresenting material facts;

(e) Whether the market prices of CIC securities were artificially inflated during the Class Period due to the alleged material omissions and/or misrepresentations; and

(f) The proper measure of damages sustained by the members of the proposed class.

GT does not challenge the certification of the proposed class for lack of commonality. The Court concludes that there are sufficient questions of fact and law common to the proposed class to satisfy Rule 23(a)(2).

### 3. *Typicality*

Rule 23(a)(3) requires that the claims of the representative parties be typical of the claims of the class. "Typicality" does not mean that the claims of the representative parties must be identical to those of the other class members. *Phillips v. Joint Legislative Comm. on Performance & Expenditure Review*, 637 F.2d 1014, 1024 (5th Cir. 1981); *see also Kalodner v. Michaels Stores, Inc.*, 172 F.R.D. 200, 205 (N.D.Tex.1997). Rather, typicality is found when the representative plaintiff's claims arise out of the same event or course of conduct as do the other class members' claims, and are based on the same legal theories. *Durrett v. John Deere Co.*, 150 F.R.D. 555 (N.D.Tex.1993). The test for typicality is not extremely rigorous. *See Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir.1993).

Plaintiffs allege that the typicality requirement is satisfied, as each proposed class member purchased CIC common stock in reliance upon misrepresentations and omissions allegedly contained in information publicly disseminated by Defendants. GT, on the other hand, argues that Plaintiffs fail to meet the Rule 23(a)(3) requirement because the element of reliance must be individually proven for each class member.

The issue of reliance will be discussed in further detail in the Court's analysis of the Rule 23(b)(3) predominance element; however, the Court finds the typicality requirement of Rule 23(a)(3) otherwise satisfied, as Plaintiffs' claims arise out of the same course of conduct, and are based on the same legal theories.

### 4. *Adequacy of Representation*

Rule 23(a)(4) requires that the representative parties fairly and adequately protect the interests of the class. Courts have consistently applied a two-prong test in assessing the adequacy of representation: (1) whether

the named plaintiffs have interests antagonistic to those of the class; and (2) whether the plaintiffs' attorney is qualified to conduct the proposed litigation. *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468 (5th Cir.1986).

No evidence of antagonistic behavior between the class representatives and the remaining members of the proposed class has been presented to the Court. Because the class representatives and the remaining members assert a common right, their interests are not antagonistic for representation purposes. *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir.1981), *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982). Further, Plaintiffs meet the second prong of the two-part test. GT does not contend that Plaintiffs' counsel is unqualified. Plaintiffs' counsel has extensive experience in the prosecution of securities class actions, and the Court finds that counsel is qualified.

Thus, the Court concludes that Plaintiffs have satisfied the four requirements of Rule 23(a).

**B. Fed.R.Civ.P. 23(b)(3)**

Rule 23(b)(3) requires that common questions of fact or law predominate and that a class action be superior to other methods of adjudication.

Plaintiffs argue that the market price of CIC stock was artificially inflated, and that they are entitled to a presumption of reliance on material misrepresentations and omissions by the Defendants. Therefore, Plaintiffs conclude, there are common questions that predominate. GT, on the other hand, argues that because individual issues of reliance predominate, the class cannot be certified.

**1. *Preponderance of Common Questions of Law and Fact***

According to the Advisory Committee's notes to Rule 23(b)(3), a fraud case may be unsuitable for class action treatment if there is a material variation in the representations made or in the kinds or degrees of reliance

by the persons to whom they were addressed. In *Castano*, the Fifth Circuit clarified that a fraud class action cannot be certified when individual reliance will be an issue. *Castano*, 84 F.3d at 745. Therefore, this Court must inquire into the issue of reliance. *Young v. Nationwide Life Ins. Co.*, 183 F.R.D. 502, 510 (S.D.Tex.1998). Here, the Plaintiffs allege that class-wide reliance can be presumed on the basis of one of two theories: the "fraud on the market theory" or the *Affiliated Ute* doctrine.

**a. Fraud on the Market Theory**

Plaintiffs ask this Court to presume reliance because Defendants have committed a fraud on the market. The fraud on the market theory obviates the need to prove subjective reliance, because of the interposition of the market between the buyer and the seller. *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

As adopted in *Basic*, the fraud on the market theory applies to *open* and *efficient* markets. The fraud on the market theory creates a presumption that:

> An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action.

*Id.* at 247, 108 S.Ct. 978. A defendant may rebut this presumption by showing that the stock price was unaffected by the fraud, or that the plaintiff would have made the purchase regardless of the undisclosed information. *Zlotnick v. TIE Communications*, 836 F.2d 818, 822 (3d Cir.1988). The question of whether the fraud on the market theory can substitute for proof of direct reliance presents questions of law and fact. *See Cammer v. Bloom*, 711 F.Supp. 1264, 1277 (D.N.J. 1989); *Guenther v. Pacific Telecom, Inc.*, 123 F.R.D. 333, 339 (D.Or.1988).

CIC's stock was traded on the over the counter bulletin board ("OTCBB"),[5] and

---

5. Plaintiffs alleged in their Complaint, as well as in their Motion for Class Certification, that CIC's common stock was listed and actively traded on NASDAQ. Defendants call this assertion "simply

inaccurate" and instead state that the CIC stock was listed on the OTCBB, "a quotation system for small or inactively traded companies." De-

to determine whether the fraud on the market theory applies, this Court must decide whether Plaintiffs have proven that the OTCBB market was efficient.[6] Stocks traded in an over the counter market are circulated daily on "pink sheets" that contain the "bid" and "ask" prices, but do not include trading information. *Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir.1999). While a limited number of courts have held that stock traded in an over the counter market is *per se* traded in an inefficient market,[7] the majority of courts hold that "the inquiry in an individual case remains the development of the market for that stock, and not the location where the stock trades." *See Harman v. LyphoMed, Inc.*, 122 F.R.D. 522, 525 (N.D.Ill.1988); *see also Cammer*, 711 F.Supp. at 1286–87.

In evaluating whether the market for an individual stock is efficient, courts have looked to a number of factors. *See, e.g., Cammer*, 711 F.Supp. at 1286–87; *O'Neil v. Appel*, 165 F.R.D. 479, 503 (W.D.Mich.1996). The *Cammer* court identified five factors relevant to the determination of market efficiency:[8] (1) the stock's average trading volume; (2) the number of analysts that followed and reported on the stock; (3) the number of market makers; (4) eligibility to file an S–3 Registration Statement; and (5) the reaction of the stock price to unexpected news events. *Cammer*, 711 F.Supp. at 1286–87. Other courts have applied additional factors, based on economic literature, including: (1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the "float"). *See Serfaty v. Int'l Automated Sys.*, 180 F.R.D.

418, 423 (D.Utah 1998); *O'Neil*, 165 F.R.D. at 503.

### (i). Stock's average trading volume

■ A large weekly volume of stock trades suggests significant investor interest in the company. *See Cammer*, 711 F.Supp. at 1286. "Such interest … implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Id.* This indicator appears to be one of the most important in gauging the efficiency of the market for a particular stock. *See, e.g., Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1122 (5th Cir.1988); *Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 360 n. 8 (5th Cir.1987).

Through their expert, Alan Miller ("Miller"), Plaintiffs contend that during the class period, the average weekly turnover of CIC stock was between .81 % and 2.3 %. In *Cammer*, the court held that "[t]urnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption." 711 F.Supp. at 1286.

According to *Cammer*, stock turnover is to be measured as a percentage of the total outstanding shares. However, Plaintiffs' expert, Miller, measured the stock turnover as a percentage of the float, which represents significantly less shares than the total outstanding shares, since it excludes stock held by insiders.

GT's expert, Charles Cox ("Cox"), measured the stock turnover as a percentage of

---

fendant GT's Memorandum in Opposition to Plaintiffs' Motion for Class Certification 2. In their Reply Memorandum, Plaintiffs concede that CIC's stock was traded only on the OTCBB.

**6.** As stated in *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 198 (6th Cir.1990):

The fraud on the market theory cannot be applied logically to securities that are not traded in efficient markets. An inefficient market, by definition, does not incorporate into its price all the information about the security (citations omitted). Investors, therefore, cannot be presumed to rely reasonably on the integrity of the market of a security that is traded in such a market.

**7.** The Third Circuit has held that an over the counter market does not constitute an "active and substantial" market, which is what the fraud on the market theory assumes. *In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 138 (D.N.J.1984); *see also Epstein v. American Reserve Corp.*, No. 79 C 4767, 1988 WL 40500 (N.D.Ill. Apr.21, 1988) (denying class certification because the OTC market was incapable of meeting *Basic's* test of market efficiency).

**8.** Other circuits have accepted the *Cammer* test. *See, e.g., Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir.1999); *Hayes v. Gross*, 982 F.2d 104, 107 (3d Cir.1992); *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir.1990).

the total outstanding shares, and that calculation yielded a weekly median trading volume of 0.1 %. (Even calculated on float, Cox's analysis yielded a weekly median trading volume of 0.3 %). This percentage is one-tenth to one-twentieth (or roughly one-third to one-eighth if using float) of *Cammer's* threshold range for a presumption of market efficiency. *See id.* at 1293. GT notes that for two trading months (forty-five days), not one share of CIC common stock changed hands. The Court finds that CIC stock was not actively traded, and this factor weighs heavily against a finding of market efficiency.

### (ii). Number of Securities Analysts

■ The more securities analysts who follow and report on a company's stock, the greater the likelihood that information disseminated by a corporation is being relied upon by the stock trading public. *See Cammer*, 711 F.Supp. at 1286. The presence of a substantial number of such analysts indicates that the stock was closely reviewed by investment professionals, who made buy/sell recommendations to client investors based on information publicly available about the company. *See id.*

Plaintiffs allege that "at least two analysts," Premier Capital Management ("Premier") and a regional firm, Attkisson Carter & Akins, Inc., of Atlanta, Georgia, followed and reported on CIC's stock during the class period. A report by Premier was inserted into *Mutual Funds* magazine, which has a subscription base of 750,000. Plaintiffs allege that CIC was also regularly covered by Market Guide, Moody's Investors Service and Securities Data Company.

GT, in contrast, claims there were no independent analyst reports on CIC during the Class Period.[9] Moreover, GT argues, and the Court finds, that the Premier Report does not represent independent coverage by a securities analyst, but is instead an advertisement, paid for by CIC.[10] "Advertisements, press releases, and other information

disseminated by the [companies] themselves ... is not a substitute for reports made by securities analysts." *Serfaty*, 180 F.R.D. at 422. The existence of one remaining independent analyst, Attkisson, and coverage by Moody's and similar publications, is insufficient to cause this factor to weigh in favor of market efficiency.

■ Plaintiffs argue that the limited number of analyst reports that covered CIC does not necessarily reflect a lack of investor interest, but rather, a preference of individuals to do their own Internet research. Plaintiffs argue that the Internet has lessened the importance of the number of analyst reports and that this factor should, therefore, not be significant in analyzing market efficiency. Plaintiffs further argue that the Internet renders all of *Cammer's* analysis significantly less compelling.

While GT acknowledges that the Internet has made information more readily available, it disagrees that the number of independent analysts has generally declined as a result, and disagrees that the other *Cammer* factors are no longer determinative of market efficiency. As GT points out, a number of cases within the past few years have analyzed market efficiency, and in none of those cases have the courts made any suggestion that the Internet has rendered inapplicable the factors set forth in *Cammer* and in economic studies. *See, e.g., Binder v. Gillespie*, 184 F.3d 1059 (9th Cir.1999); *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298 (S.D.Tex. 2000); *O'Neil v. Appel*, 165 F.R.D. 479 (W.D.Mich.1996); and *Serfaty v. Int'l Automated Sys.*, 180 F.R.D. 418 (D.Utah 1998).

This Court determines that although the Internet makes a variety of information more readily available to the public, that fact does not negate the relevance of the indicia of market efficiency set forth in *Cammer* and other authorities.

9. In so claiming, Cox searched a database, known as Investex, for securities analyst reports on CIC. Cox acknowledged that Investex does not include all analysts. Cox Aff. 101–02.

10. Miller admitted in his testimony that every page of one version of Premier's report bore the

caption "Advertisement." Apparently, at least one of the Plaintiffs claims to have received another version of the report, which was not expressly labeled advertisement. Hearing on Plaintiffs' Motion for Class Certification 209.

*(iii).   Number of Market Makers*

■   In *Cammer,* the court held that the existence of numerous market makers might support an inference that a company's stock is traded in an efficient market.  *Id.* at 1286–87.  In contrast, in *O'Neil v. Appel,* the court held that the existence of a large number of market makers, without more, is virtually meaningless in establishing whether that market is efficient.   165 F.R.D. at 501–02.  According to *O'Neil,* what is important is "the volume of shares that they committed to trade, the volume of shares they actually traded, and the prices at which they did so."  165 F.R.D. at 502 (noting that the economic literature has criticized reliance on the number of market makers as an indicator of efficiency) (citing Victor L. Bernard, Christine Botosan & Gregory D. Phillips, *Challenges to the Efficient Market Hypothesis: Limits to the Applicability of Fraudon–the–Market Theory,* 73 Neb. L. Rev. 781, 799, 805 (1994);  Brad M. Barber, Paul A Griffin & Baruch Lev, *The Fraud–on–the–Market Theory and the Indicators of Common Stock's Efficiency,* 19 J. Corp. L. 285, 307 (1994)).

Plaintiffs allege that of the thirty brokerage firms participating in the market for CIC stock,[11] six to ten of them were market makers with a strong interest in CIC stock.[12] This Court concludes that the mere presence of market makers does not indicate market efficiency.  *See O'Neil,* 165 F.R.D. at 501–02; *see also Serfaty,* 180 F.R.D. at 422 ("evidence of the number of market makers, without more, does not weigh in favor of a finding of an efficient market.");  *Griffin v. GK Intelligent Sys., Inc.,* 196 F.R.D. 298, 304 (S.D.Tex. 2000) ("[t]he number of market makers has limited probative value.").

*(iv).   Eligibility to File S–3 Registration Statement*

■   Cases finding market efficiency have focused on eligibility for filing of an S–3 Registration Statement, finding that the SEC permits it "only on the premise that the stock is already traded on an open and effi-

cient market, such that further disclosure is unnecessary."  *O'Neil,* 165 F.R.D. at 502; *accord Cammer,* 711 F.Supp. at 1287.  According to SEC regulations, certain companies may use the S–3 short form, rather than Form S–1, to register securities if they are sufficiently large and have filed reports with the SEC for the requisite period of time.  Corporations permitted to use the S–3 form are thus presumed to be actively traded and widely followed.  *See Harman,* 122 F.R.D. at 525.  Therefore, a company's ability to file an S–3 Registration Statement points to market efficiency.

Plaintiffs allege that CIC was entitled to file S–3 Registration Statements for its public offerings.  According to SEC regulations, issuers are entitled to use this form if they are registered pursuant to Section 12(g) of the Exchange Act, current in their SEC filings for the last twelve months, and have stock held by non-affiliates with an aggregate market value greater than $75 million.  Plaintiffs claim that a review of CIC's 1996 Form 10–KSB reveals that CIC met each of these requirements.

To the contrary, GT argues that S–3 eligibility is not an important factor in determining market efficiency because the SEC requirements for S–3 eligibility were substantially reduced after the *Cammer* decision was rendered.  Specifically, GT argues that when *Cammer* was decided, "companies could qualify to use the S–3 Registration Form only if they had filed SEC reports continuously for thirty-six months and had at least $150 million in float."  Defendant GT's Supplemental Memorandum 15 (citing *Cammer,* 711 F.Supp. at 1271 n. 5).  CIC would not have satisfied those more rigorous requirements.

Several cases subsequent to *Cammer* and the modifications to S–3 eligibility have held that S–3 eligibility is still an important factor in determining market efficiency.  *See e.g., Griffin,* 196 F.R.D. at 304;  *Serfaty,* 180

---

11.   The term "market participant" includes the "brokers, dealers, broker-dealers, [and] traders . . . as the primary participants," and "not all of them are market makers."  Deposition of Alan Miller at 82 and 184.

12.   Miller admitted that the term "market participant," which he used in his affidavit in analyzing this factor, is far broader than the term "market maker."  Miller Aff. ¶ 18b.  Thus, the focus on market participants varies from *Cammer's* third factor.

F.R.D. at 422; *O'Neil,* 165 F.R.D. at 502. This Court concurs, and holds that CIC's eligibility to file an S–3 Registration Statement weighs in favor of a finding of an efficient market.

### (v). Reaction of the Stock Price to Unexpected News Events

■■■ *Cammer* holds that evidence of a causal relationship between unexpected corporate events or financial releases and an immediate response in the stock price is an important indicator of market efficiency. *See Cammer,* 711 F.Supp. at 1287 (noting that this factor is "the essence of an efficient market and the foundation for the fraud on the market theory."). *See also In re 2TheMart.com, Inc.,* 114 F.Supp.2d 955, 964 (C.D.Cal.2000) (holding that the fifth *Cammer* factor may be the most significant in determining market efficiency).

"An efficient capital market is one in which the price of the stock at a given time is the best estimate of what the price will be in the future." *Finkel,* 817 F.2d at 360 n. 8 (quoting Fischel, *Use of the Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities,* 38 BUS. LAW 1, 4 n. 9 (1982)). Hence, in an efficient market, a stock's price remains relatively stable in the absence of news, and changes very rapidly as the market receives new and unexpected information.

Plaintiffs allege that CIC's stock price rose and fell in response to positive and negative news. According to Miller, there was a correlation between CIC's stock price and the news about CIC reported in ninety-five news articles.

On the other hand, GT argues that CIC stock was highly volatile, and that its movements were not indicative of an efficient market. *See O'Neil,* 165 F.R.D. at 503 (no efficient market where price movements were "random and volatile"). While GT acknowledges that efficient stocks may have variable stock prices if the variability can be explained by movements in the stock market, it claims that movements in the stock market did not account for CIC's volatility.[13] GT's expert, Cox, found no consistent correlation between the disclosure of news about CIC and rapid movements in CIC's stock price.[14] The Court's review of the changes in price leads it to conclude that its relationship to news is inconsistent at best.

Because Plaintiffs have failed to show any reliable relationship between changes in CIC's stock price and news events, the Court concludes that this factor weighs heavily against a finding of market efficiency.

### (vi). Other Factors

Economic theory suggests that several other factors may be relevant in determining market efficiency. *See O'Neil,* 165 F.R.D. at 503 (citing Barber et al., *The Fraud–on–the–Market Theory,* at 291–92; Robinson, *Fraud–on–the–Market Theory and Thinly Traded Securities Under Rule 10b–5: How Does a Court Decide If a Stock Market is Efficient,* 25 WAKE FOREST L. REV. 223 (1990)).

---

13. Cox calculated the standard deviation of CIC's stock return, a widely-used measure of volatility, and found the median standard deviation for weekly trading for CIC to be twelve percent, which he concluded was highly variable. Hearing on Plaintiffs' Motion for Class Certification 47. Based on this statistical analysis, Cox found "very little relationship between information and [CIC's] stock price movements." Cox Depo. 48.

14. In his analysis, Cox analyzed news reported in the Dow Jones news wire, Bloomberg, the local news, the financial press, and 10Ks and 10Qs. Cox found a total of twenty-six news items during the class period. Miller identified a total of ninety-five news events. In criticizing Miller's approach, Cox opined that Miller incorrectly considered a number of news events that were not publicly available, or were repetitious of previous news. The Court agrees that Miller considered repetitive reporting and some items that were not significant news.

Additionally, there was a discrepancy between the parties' experts regarding the number of days it would take for the price of a stock, traded in an efficient market, to adjust to news events. While Cox testified that a stock price should adjust in no more than two days in an efficient market, Miller argued that in an efficient market, the impact of news on the price of a stock such as CIC's will typically last approximately one week to ten days. Hearing on Plaintiffs' Motion for Class Certification 158. The Court concludes such a lengthy time frame is inconsistent with the concept of market efficiency. The Court further finds that the stock did not consistently react to news in the manner one (and Miller, in particular) would predict for stock trading in an efficient market.

Cox analyzed CIC's stock on these indicia of market efficiency, including market capitalization, bid-ask spread, and float, by comparing CIC stock to a random sample of one hundred stocks traded on NASDAQ, the American Stock Exchange, and the New York Stock Exchange. Cox concluded that each of these factors indicated that CIC stock traded in an inefficient market during the class period.

Plaintiffs criticize Cox's statistical method, arguing that it unfairly compares CIC with much larger corporations. Specifically, Plaintiffs complain that Cox's analysis is skewed, as it compares CIC with exchange-traded and NASDAQ stocks, many of which are heavily capitalized.

### (a) Market Capitalization

■ Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations. *See O'Neil*, 165 F.R.D. at 503. Cox found that CIC's market capitalization was in the top sixty percent of his sample group. In the Court's view, CIC's market capitalization weighs slightly in favor of a determination of market efficiency.

### (b) Bid–Ask Spread

■ The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares. Cox Aff. ¶ 15. A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade. Cox Aff. ¶ 15. Courts have looked to a stock's bid-ask spread in assessing the efficiency of its market. *See Serfaty*, 180 F.R.D. at 423; *O'Neil*, 165 F.R.D. at 503. Cox concluded that CIC had a median bid-ask spread of approximately 5.6% of its closing price, placing it in the highest quartile of the sample used in his study. The Court finds that CIC's bid-ask spread suggests market inefficiency.

### (c) Float

■ In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders. *See O'Neil*, 165 F.R.D. at 503. "Because insiders may have private information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security." Cox Aff. ¶ 14. Cox concluded that fifty-four percent of CIC's shares of stock were held by insiders, placing CIC's float in the lowest ten percent of Cox's sample. Therefore, CIC's relatively low float weighs against a finding of market efficiency.

### (vii). Conclusion

■ In summary, the Court concludes that most of the factors identified by *Cammer* and in economic literature relied upon by other cases weigh against a finding of market efficiency for CIC stock, and the Court finds that the presumption of market efficiency, which would support an application of the fraud on the market theory, does not apply. Therefore, proof of individual reliance would be required, and Plaintiffs do not satisfy the predominance element of Rule 23(b)(3).

### b. *Affiliated Ute* Doctrine

■ The Supreme Court has held that in fraud cases involving primarily a failure to disclose, rather than misrepresentations, proof of reliance is not a prerequisite to recovery. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152–53, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). All that is required is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of the investment decision. *Id.* Following *Affiliated Ute*, the Fifth Circuit recognized that where the gravamen of the fraud is a failure to disclose, as opposed to a fraudulent misrepresentation, a plaintiff is entitled to a rebuttable presumption of reliance. *Smith v. Ayres*, 845 F.2d 1360, 1363 (5th Cir.1988).

■ However, the *Affiliated Ute* doctrine does not apply where the plaintiff alleges that the defendant "has distorted the truth by making true but misleading incomplete statements." *Abell*, 858 F.2d at 1119 (holding that the *Affiliated Ute* doctrine applies

only in cases where "the complaint is grounded primarily in allegations that the defendant has failed to disclose any information whatsoever relating to the material facts about which the defendant has a duty to the plaintiff to disclose"). Moreover, *Affiliated Ute* does not apply to "mixed claims" that allege both misstatements and material omissions. *Huddleston v. Herman & MacLean*, 640 F.2d 534, 548 (5th Cir.1981), *aff'd in part, rev'd in part*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Therefore, Plaintiffs must demonstrate to the Court that the gravamen of their case is GT's failure to disclose material facts, as contrasted with misrepresentation.

■ As pleaded in their Amended Complaint, the thrust of Plaintiffs' claim against GT is that it "falsely represented that its audits of CIC's 1996 and 1997 financial statements had been conducted in accordance with generally accepted auditing standards ... [and GT] ... falsely stated that those financial statements fairly presented CIC's financial condition and results of operations in conformity with generally accepted accounting principles." Amended Complaint ¶ 20(a). The Fifth Circuit has held that the *Affiliated Ute* doctrine does not apply where "[n]on-disclosure is relevant only [insofar] as it makes the statements either false or misleading." *Smith*, 845 F.2d at 1363. The Court concludes that Plaintiffs' claims are not primarily failure to disclose allegations, and thus, do not fall under the *Affiliated Ute* exception to proof of reliance.[15]

### c. Conclusion Regarding Rule 23(b)(3) Predominance Requirement

Plaintiffs have not established that they are entitled to presumptions of reliance under the fraud on the market theory or the *Affiliated Ute* doctrine. Therefore, Plaintiffs

have failed to meet their burden to prove that the common questions of law or fact predominate over any questions affecting only individual members.

### 2. Superior Method of Adjudication

■ Subsection 23(b)(3) additionally requires proof that a class action is the superior method of adjudication. Plaintiffs contend that securities fraud class actions are generally found to satisfy the superiority requirement. As the court held *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 112 F.R.D. 383, 389 (S.D.N.Y.1986), based on the number of potential plaintiffs, the relatively small amount of an individual shareholder's damage, and the potentially large liability of defendants, class action securities fraud litigation is often superior to alternative methods of adjudicating such disputes.

Here, issues of reliance detract from the superiority of the class action device in resolving this securities fraud action. *See Griffin*, 196 F.R.D. at 305. Moreover, there is no evidence that individual trials would create "a judicial crisis." *See Castano*, 84 F.3d at 748. Thus, the Court concludes that a class action is not "superior to other available methods for the fair and efficient adjudication of the controversy." *Griffin*, 196 F.R.D. at 305–06. *See also O'Neil*, 165 F.R.D. at 507 ("Where individual hearings are required on questions of reliance, causation, and damages, the case is 'hardly the picture of judicial economy envisioned by Rule 23.'") (quoting *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 681 (N.D.Ohio 1995)).

### C. Common Law Fraud Claim

■ To prove their common law fraud claim under Texas law, Plaintiffs must prove reliance. *Young*, 183 F.R.D. at 507.[16] For

---

**15.** The Court notes that Plaintiffs have attempted in their Motion for Class Certification to restate their claims to bring them within the *Affiliated Ute* doctrine. Such an attempted recharacterization of a claim from a misrepresentation to an omission claim, even if that could be done through the class certification motion rather than the Complaint, will not suffice; "such a circular argument would result in every case of misrepresentation becoming a case of omission as a result of defendant's failure to correct a misrepresentation." *Young*, 183 F.R.D. at 510.

**16.** Relying on *Longden v. Sunderman*, 123 F.R.D. 547 (N.D.Tex.1988), Plaintiffs argue that common issues may still predominate "even if individual reliance trials were necessary." Plaintiffs' Reply 17. However, *Longden* has since been superseded by *Castano*, which holds that a fraud class action cannot be certified when individual issues of reliance are present. *Castano*, 84 F.3d at 745.

the reasons that the Court declines to certify the class with respect to Plaintiffs' 10b–5 claims, so does the Court decline to certify the class with respect to Plaintiffs' common law fraud claims.

## IV. Conclusion

For the reasons described above, the Court concludes that Plaintiffs have failed to establish the existence of the elements of Rule 23(b)(3). As a result, the Court declines to certify Plaintiffs' Complaint as a class action. Plaintiffs' Motion for Class Certification is therefore DENIED.

**SO ORDERED.**